**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ESSEX INSURANCE COMPANY, | ) |
| Plaintiff, | ) |
| v. | ) |
| VILLAGE OF OAK LAWN, TODD TENISON, and SCOTT KIRK, | ) No. 14-cv-4572 |
| Defendants. | ) |
| _____ | ) |
| VILLAGE OF OAK LAWN, TODD TENISON, and SCOTT KIRK, | ) |
| Third-Party Plaintiffs, | ) |
| v. | ) |
| CANNON COCHRAN MANAGEMENT SERVICES, INC., | ) |
| Third-Party Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). (R.100, R.104). Plaintiff Essex Insurance Company ("Essex") seeks a declaration that it has no duty to indemnify its insured, Defendant Village of Oak Lawn ("Village" or "Oak Lawn"), because Oak Lawn breached the notice condition of Essex's insurance policy with respect to an underlying lawsuit. (R.100). Third-Party Defendant Cannon Cochran Management Services, Inc. ("CCMSI") seeks a declaration that it provided timely notice of that lawsuit to Essex on behalf of Oak Lawn. (R.104). Oak Lawn joins CCMSI's motion.

For the following reasons, the Court grants CCMSI's motion and denies Essex's cross-motion.  In light of this disposition, the Court denies as moot Oak Lawn's motion to defer or, alternatively, to extend the filing of dispositive motions directed to the Third-Party Complaint. (R.94).[1]

## BACKGROUND

In this action, Essex seeks a declaration that it has no duty to indemnify Defendants with respect to an action filed against them by Charles Petrishe, Nikki Caputo-Petrishe, and Dianne McGann in the United States District Court for the Northern District of Illinois, captioned *Nikki Caputo-Petrishe et al. v. Oak Lawn Police Officers Todd Tenison and Scott Kirk et al.*, 1:10-cv-7950 (the "Underlying Action").  (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶¶ 6, 19; *see also* R.37, Second Am. Compl. ¶ 1).[2]  The Underlying Action resulted in a $3 million settlement agreement between the parties, with Defendants' two insurance companies—Essex and non-party Illinois Union Insurance Company ("ACE")—paying out $1 million and $2 million, respectively.  (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶¶ 35-37).  Essex now seeks to recoup that $1 million payment, along with applicable interest, pursuant to a Non-Waiver Agreement that it entered into with Oak Lawn as a condition precedent to settlement.  (*Id.* ¶¶ 8, 38-39; R.37, Second Am. Compl. at Prayer for Relief; R.37-A, Non-Waiver Agreement).  The Non-Waiver

---

[1]  The Court has requested supplemental briefing on Oak Lawn's motion for summary judgment with respect to Counts VIII and IX of the Second Amended Complaint.  (R.90).  The Court defers ruling on that motion.

[2]  Essex is an insurance corporation organized under Delaware law with its principal place of business in Virginia.  It is authorized to issue excess insurance in Illinois.  Oak Lawn is a municipal corporation organized under Illinois law and located in Cook County, Illinois.  Police Officers Tenison and Kirk are citizens and residents of Illinois and employees of Oak Lawn. (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶¶ 1-3).  Third-Party Defendant CCMSI contracted with Oak Lawn to provide it claims management services as its third-party claims administrator. (R.98, CCMSI Rule 56.1(a)(3) Stmt. Facts ¶ 2).  CCMSI is an Illinois corporation with its principal place of business in Illinois.  (R.44, CCMSI Answer to Third Party Compl. ¶ 4).

Agreement provides, in relevant part, that Essex's contribution to the underlying settlement "is without prejudice, shall not be deemed a waiver or estoppel against Essex of its rights and defenses under the Essex Policy, and shall not be otherwise used against Essex in any action," including this action. (R.37-A, Non-Waiver Agreement at ¶ 2).[3] Essex now argues that: (i) it is entitled to a finding that Oak Lawn breached its insurance policy; and (ii) Oak Lawn must therefore reimburse Essex for its settlement payment under the Non-Waiver Agreement. Oak Lawn disagrees, arguing that it did not breach the insurance policy and therefore has no obligation to reimburse Essex.

## I.     The Policies

This case concerns the interpretation of two insurance policies issued to Oak Lawn. The Court addresses each policy, in turn.

### A.     The ACE Policy

First, ACE issued to Oak Lawn Public Entity Retained Limits Policy number PEP G2488529A, covering a policy period of March 15, 2010 to March 15, 2011 (the "ACE Policy"). (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 9; R.6-2, ACE Policy). The ACE Policy had a liability limit of $2 million per occurrence and $5 million in the aggregate, and was excess over the Village's self-insured retention ("SIR") of $150,000. (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶¶ 10-12). The ACE Policy contained the following notice condition (the "ACE Notice Condition"):

8.     Duties In the Event of **Accident, Occurrence, Wrongful Act, or Claim**

a.     **You** must see to it that:

---

[3] The Non-Waiver Agreement, however, also limits Essex's potential recovery from this action, capping Essex's recovery at $350,000 except under circumstances relating to the Third-Party Complaint. (*Id.* at ¶¶ 4-5; *see also* R.113, CCMSI Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 8, 38-39).

   i.  **We** are notified in writing as soon as practicable once **You** have knowledge of any **Accident, Occurrence or Wrongful Act** which may reasonably and subsequently give rise to a **Claim** being made against an **Insured** that is likely to result in liability for **Us** under this Policy.

   ii.  You immediately make a written record of specific information about any **Claim** which appears reasonably likely to involve indemnification under this **Policy**, including but not limited to . . . (*excerpted*)

   iii.  **You** notify **Us** in writing as soon as practicable and provide **Us** with all the information required under section ii above.

  b.  **You** must notify **Us** and provide information in the manner specified above of any **Accident, Occurrence, Wrongful Act** or **Claim**, regardless of the coverage or liability, which:

   i.  Results in the establishment of a reserve, or would reasonably require the establishment of a reserve, for **Damages** which equals or exceeds 50% of the **Retained Limit**; or

   ii.  Involves a notice of **Claim** for a **Wrongful Act** which is reasonably likely to equal or exceed 25% of the **Retained Limit**; or

   iii.  Involves any of the following:

     9.  **Bodily injury** resulting from use of a weapon or restraining device by law enforcement.

(R.98, CCMSI Rule 56.1(a)(3) Stmt. Facts ¶ 5; R.6-2, ACE Policy at Section A-8).[4]

The ACE Policy also included the following insuring agreement:

  The **Insurer** will indemnify the **Insured** for **Damages** and **Claim Expenses** in excess of the **Retained Limit** for which the **Insured** becomes legally obligated to pay because of a **Claim** first arising out of an **Occurrence** happening during the **Policy Period** in the Coverage Territory for **Bodily Injury, Personal Injury, Advertising Injury,** or **Property Damage** taking place during the **Policy Period**.

  No other obligation to pay any additional sums, perform acts or provide services is covered.

---

[4] The ACE Policy further defined "Claim" as including: "[a] written demand against any Insured for monetary damages or non-monetary or injunctive relief;" and "[a] civil proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading[.]" (R.6-2, ACE Policy at Section B-7).

(R.115, Essex Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 38; R.6-2, ACE Policy at General Liability Coverage Part, Section A).

**B.    The Essex Policy**

Second, Essex issued to Oak Lawn Excess Liability Policy number XOMW120310, covering a policy period of March 15, 2010 to March 15, 2011 (the "Essex Policy").  (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 13; R.6-1, Essex Policy).  The Essex Policy had a liability limit of $10 million per occurrence and $10 million in the aggregate, and was excess over other underlying policies, including the ACE Policy.  (R.113, CCMSI Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 14-15; R.6-1, Essex Policy at Declarations Items 3 and 4, and Schedule of Underlying Coverages; *see also* R.115, Essex Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 33-34).  The Essex Policy contained an insuring agreement, which provided that Essex:

> hereby agrees to pay on behalf of the insured that portion of Ultimate Net Loss in excess of the limits of Underlying Insurance as shown in Item 4, of the Declarations, but only up to an amount not exceeding the Company's Limit of Liability as shown in Item 3 of the Declarations.  Except for the Terms, Definitions, Conditions and Exclusions of this policy, the coverage provided by this policy shall follow the Insuring Agreements, Definitions, Conditions and Exclusions of the Controlling Underlying Insurance Policy as shown in Item 4 of the Declarations.

(R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 16; R.6-1, Essex Policy at Section A).

The Essex Policy also contained the following condition (the "Notice Condition"):

**Duties in the Event of Accident, Occurrence, Claim or Suit.**

You must see to it that we or our authorized representative and your underlying insurers:

    a.    are notified as soon as practicable of any accident or occurrence which may result in a claim if the claim may involve this policy or any underlying insurance;

    b.    receive notice of the claim or suit as soon as practicable. Notice shall include:
        1)    How, when and where the accident or occurrence took place;
        2)    The insured's name and address;
        3)    The names and addresses of any injured persons and

witnesses; and

    4)    The nature and location of any injury or damage arising out of the accident or occurrence.

    c.    are assisted, upon our request, in the enforcement of any right against any person or organization which may be liable to you or any other Insured because of injury or damage to which this insurance may apply; and

    d.    receive the Insured's full cooperation in the investigation, adjustment, settlement, or defense of any claim or suit.

In addition, it is a requirement of this policy that:

    a.    the Insured not make any admission of liability;

    b.    no Insured will, except at their own cost, voluntarily make a payment, assume any obligation or incur any expense other than for first aid without our written consent;

    c.    you immediately send us copies of any demands, notices, summonses or legal paper received in connection with a claim or suit involving you or any other Insured.

(R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 17; R.6-1, Essex Policy at Section C-3).

The Essex Policy further contained the following condition (the "Defense Condition"):

**Defense.**

The Company shall not be called upon to assume charge of the investigation, settlement or defense of any claim made, or suit brought, or proceedings instituted against the Insured, but shall have the right and be given the opportunity to be associated in the defense and trial of any such claim, suit or proceeding relative to any occurrence which, in the opinion of the Company, may create liability on the part of the Company under the terms of this policy. If the Company avails itself of such right and opportunity the Company shall do so at its own expense.

Court costs and interest, if incurred with the consent of the Company, shall be borne by the Company and other interested parties in the proportion that each party's share of the Ultimate Net Loss bears to the total amount of Ultimate Net Loss sustained by all interested parties.

(R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 18; R.6-1, Essex Policy at Section C-4).

## II.    Factual Background

Having reviewed applicable policy provisions, the Court turns its focus to the additional undisputed facts bearing on the present summary judgment motions.

### A.    2010

The original complaint in the Underlying Action alleged that, on December 8, 2010, Defendants Tenison and Kirk responded to a 911 call placed by plaintiff Nikki Caputo-Petrishe, informing them that her husband, Charles Petrishe ("Petrishe"), was acting suicidal by cutting himself with a kitchen knife.  (R.101-5, *Petrishe* Compl. at ¶¶ 10-12).  Kirk and Tenison entered the Petrishe home without first speaking to Caputo-Petrishe and, once there, observed Petrishe standing ten feet away, with his arms raised and a knife in one hand.  (*Id.* ¶ 13).  The *Petrishe* Complaint continued:

> Tenison then fired his taser at Petrishe.  Kirk then fired four gun shots at Petrishe.  The first bullet hit Petrishe and entered through his torso, tearing apart his spleen and gall bladder and lodging near his spine.  As Petrishe fell to the ground, the second bullet went through Petrishe . . . As Petrishe laid on the ground, two more bullets went through Petrishe's upper body . . . All told, these four bullets damaged every vital organ except Petrishe's heart, tore apart his duodenum sac, and tore open his pericardium sac.

(*Id.* ¶ 14).  Later that night, the police informed Petrishe's family that he was under arrest for the attempted murder of Officers Tenison and Kirk.  (*Id.* ¶ 16).  According to Defendants, Petrishe "charged" at the individual officers with his knife, thus justifying their use of force and supporting the filing of criminal charges.  (R.98, CCMSI Rule 56.1(a)(3) Stmt. Facts ¶ 9).[5]

---

[5]  Defendants attach a claim note from CCMSI's liability supervisor, dated July 14, 2011, describing the video footage of the incident.  (R.98-1 at CC 00011).  This description provides: "The video begins when the officer's taser charges. The plaintiff is then tased.  There was a lot of yelling.  When the taser plug comes detached from the plaintiff, he picked up the knife and put it over his head.  The officers then immediately shot the plaintiff.  [Defense counsel] advised his only concern is that there was no time for the plaintiff to react to the instructions.  The shots were fired immediately when the plaintiff picked up the knife."  (*Id.*).  A later-dated claim note describes police reports, reciting that, after he was tased, "Petrishe took several steps to his right

Village of Oak Lawn Manager Larry Deetjen became aware of the December 8, 2010 incident that same night. (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 42) (citing Deetjen deposition testimony)). He also received a copy of the *Petrishe* Complaint one day after it was filed – December 15, 2010. (*Id.* ¶¶ 19-20). The *Petrishe* Complaint requested "actual and compensatory and punitive damages" in recognition that Petrishe had "sustained bodily injuries, as well as mental and emotional pain and suffering, humiliation, and past and future psychological damage." (R.101-5, *Petrishe* Compl. at ¶¶ 24-25).

Upon receipt of the *Petrishe* Complaint, CCMSI's liability supervisor, Ryan Fee ("Fee"), entered a claim note reflecting that the "plaintiff's allegations trigger the Village's professional law enforcement liability policy, which is a claims-made policy. Therefore, I will be placing the insurance carrier on notice of this incident immediately." (R.98-1 at CC 00001, Petrishe Claim Note, dated Dec. 15, 2010; *see also* R.101-10, Fee Dep. Tr. at 29-34, 127 (testifying to his initial belief that the ACE "package policy" included "a law enforcement part" which "might be implicated by [the] claim")). Fee did not, however, inform ACE of the *Petrishe* incident or lawsuit until a few months later. (R.101-10, Fee Dep. Tr. at 35).[6]

### B. 2011 – 2012

On January 12, 2011, the *Petrishe* plaintiffs moved to stay Underlying Action pending the related criminal proceedings against Petrishe. The district court granted the stay request on

---

and then raised the knife in his right hand above his head like a baseball pitcher to throw a pitch. Kirk then fired several shots at Petrishe who threw the knife before collapsing." (*Id.* at CC 00024-25).

[6] The Court notes other record evidence suggesting that CCMSI gave ACE notice of the Petrishe claim on or about December 15, 2010. (R.44, CCMSI Answer to Third Party Compl. ¶ 25; R.101-9, Hanigan Dep. Tr. at 37-38; R.101-7, Deetjen Dep. Tr. at 72-73). The parties do not dispute, however, Fee's deposition testimony and claim note, evidencing that he *actually* sent notice to ACE on March 15, 2011. (R.98, CCMSI Rule 56.1(a)(3) Stmt. Facts ¶ 6 (citing R.98-1 at CC 00007, Petrishe Claim Note, dated Mar. 15, 2011 (Fee E-mail to ACE: "Please find attached a new claim loss report as well as a copy of the recently filed [*Petrishe*] complaint"); *see also* R.101-10, Fee Dep. Tr. at 35, 51).

January 18, 2011. (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 32). On January 21, the *Petrishe* plaintiffs filed an Amended Complaint, which added counts against the Defendants. (*Id.* ¶ 33). CCMSI did not evaluate those additional counts or provide notice to ACE or any other carrier. (R.101-10, Fee Dep. Tr. at 131). As Fee explained, CCMSI believed that any payment would be within the Village's $150,000 SIR and, therefore, would not implicate any ACE or excess coverages. (*Id.* at 41-42, 47-48).

By this time, both CCMSI and the Village were aware that Petrishe had been in the ICU for six weeks following the shooting. (R.110, Essex Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 28; *see also* R.101-10, Fee Dep. Tr. at 127-28). By March 2011, Petrishe's claimed medical expenses had surpassed $672,000 – more than the Village's SIR. (R.101-10, Fee Dep. Tr. at 132). Fee testified that, at least by May 2011, he knew that the Village's exposure—but not its liability—could exceed the $150,000 SIR. (R.113, CCMSI Rule 56.1(b)(3)(B) Stmt. Facts ¶ 55; *see also* R.101-10, Fee Dep. Tr. at 54:12-17; *id.* at 142 (clarifying that he "wouldn't have been surprised from the beginning if the damages alone would exceed $150,000"). Yet, the Village and CCMSI did not believe that the Petrishe claim implicated either the ACE Policy or the Essex Policy because they "did not believe that there would be liability for the allegations in the *Petrishe* matter until Mr. Petrishe was found not guilty" in the parallel criminal action. (R.113, CCMSI Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 52-53). CCMSI's claim notes reflect this belief. (R.98-1 at CC 00004-5, Petrishe Claim Note, dated Feb. 15, 2011 ("The plaintiff has been charged with two counts of attempted first-degree murder for his attack on the Oak Lawn police officers. At this time, the officers' actions appear justified and warranted and therefore, we are not placing any negligence on the Officers. Therefore, we will not post a loss reserve for this claim")).

On or about March 15, 2011, CCMSI informed ACE of the Underlying Action. (R.98, CCMSI Rule 56.1(a)(3) Stmt. Facts ¶ 6). CCMSI offers several explanations for the timing of this notice. According to Fee, he gave ACE notice because the ACE Policy was expiring and because he thought "the case might have an exposure over $75,000 irrespective of liability. And, therefore, it triggers an automatic notice to the carrier." (R.101-10, Fee Dep. Tr. at 51-52; *see also* ACE Notice Condition at Section A-8(b)(i)). CCMSI's briefing offers another reason: "[s]ince the Petrishe claim involved bodily injury resulting from the 'use of a weapon,' ACE was notified of the Petrishe suit on or about March 15, 2011, in conjunction with the first amended complaint against the Village." (R.99, CCMSI Reply Br. at 7; *see also* ACE Notice Condition at Section A-8(b)(iii)(9) (requiring automatic notice, "regardless of the coverage or liability" where an occurrence or claim involves "bodily injury resulting from use of a weapon or restraining device by law enforcement")).

In July 2011, defense counsel in the Underlying Action e-mailed Fee and ACE, informing them that the "criminal prosecution is moving along very slowly . . . In the meantime, I have scanned all of our paper file materials . . . which are extremely favorable." (R.98-1 at CC 00011, Petrishe Claim Note, dated July 14, 2011). In August, Fee informed ACE, "I have a $10k initial legal reserve set at this time, pending the outcome of the plaintiff's criminal trial. As previously noted, if the plaintiff is found guilty, most of his civil complaint goes away . . . At this time, I do not anticipate this claim exceeding the $150k SIR." (*Id.* at CC 00012).

In June 2012 and again in November 2012, defense counsel in the Underlying Action informed Fee and ACE that the criminal proceedings were ongoing. (*Id.* at CC 00023, -028). Throughout this period, the Village and CCMSI held quarterly meetings to discuss the Underlying Action and other civil matters pending against the Village. (R.101, Essex Rule

56.1(a)(3) Stmt. Facts ¶¶ 50-51).  Village Manager Larry Deetjen knew throughout this period that damages in the Underlying Action—assuming liability—could exceed $1,000,000.  (R.101-7, Deetjen Dep. Tr. at 64-65).  At no time during 2011 and 2012, however, did he believe that the Village's "potential liability would involve" the ACE Policy or the Essex Policy.  (*Id.* at 39-41).

### C.    2013

On January 23, 2013, ACE advised CCMSI of its intent to close its Petrishe claim file. (R.98, CCMSI Rule 56.1(a)(3) Stmt. Facts ¶ 12) (citing R.98-1, CC 00032, Claim Note dated Jan. 23, 2013 (ACE Adjustor to Fee: "Given the $150,000 SIR I am inclined to close my file as it does not appear that ACE's [coverage] will be impacted")).  The criminal trial began around this time.  (R.115-A, March 20, 2013 Report at 7).  On February 1, 2013, the criminal court acquitted Petrishe of all charges.  (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 34).

On February 20, 2013, defense counsel in the Underlying Action e-mailed Fee:

> We have received word that the Plaintiff was acquitted in his criminal trial . . . [Plaintiff's attorney] tells me that the plaintiff's medical bills are in excess of $1,000,000 . . . As you may remember, the Village was confident that the attempted murder charges brought against the plaintiff would result in a conviction . . . the unexpected acquittal eliminates any number of legal defenses and raises the possibility that the Village of Oak Lawn and the two responding officers could potentially [be] held liable . . . I fully expect that I will be receiving a demand from the plaintiff's attorney well in excess of $5,000,000 – and likely in excess of $10,000,000.

(R.98-1 at CC 00033, Petrishe Claim Note, dated Feb. 20, 2013).  Fee responded, in part, "We will need to review the Village's excess liability policy to determine the total amount of policy limits available for this loss." (*Id.*).  It is undisputed that neither CCMSI nor the Village considered the existence of excess insurance, including the Essex Policy, until February 2013, following Petrishe's acquittal.  (R.113, CCMSI Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 53-54). February 20, 2013 was also the first time that CCMSI believed that the Petrishe claim "may involve" the underlying ACE Policy.  (R.101-10, Fee Dep. Tr. at 104-05).

On March 14, 2013—after two years and the completion of the criminal case—the district court lifted the stay in the Underlying Action. (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 34). On March 15, the Village's insurance broker e-mailed CCMSI a copy of the Essex Policy. (R.98-1 at CC 0046, Petrishe Claim Note, dated Mar. 15, 2013). The *Petrishe* plaintiffs filed a Second Amended Complaint three days later. (R.113, CCMSI Rule 56.1(b)(3)(B) Stmt. Facts ¶ 33). On March 20, 2013, defense counsel in the Underlying Action sent a report to ACE and CCMSI evaluating the Second Amended Complaint. (R.98-1 at CC 00041-43, Petrishe Claim Note, dated Mar. 20, 2013; *see also* R.115-A, March 20 Report). Defense counsel recited the Second Amended Complaint's counts and allegations, concluding, "[a]t this time we believe that the Village has a strong liability defense insofar as the video would seem to corroborate the officers' statements that Petrishe threatened them with deadly force . . . Although the case involves a significant exposure, we believe it to be a highly defensible one." (*Id.* at CC 00043). The March 20 Report noted, however, that Petrishe's medical expenses could reach $2.5 million. (*Id.*). Defense counsel thus estimated, using jury multipliers from excessive force cases, that the Village's overall exposure could fall somewhere between $3.375 million and $7.5 million. (*Id.*; *see also* R.113, CCMSI Rule 56.1(b)(3)(B) Stmt. Facts ¶ 56; R.121, Village Rule 56.1(b)(3)(C) Reply ¶¶ 24-26). The Village subsequently adjusted its reserve for the Petrishe claim. (R.98-1 at CC 00044-45, Petrishe Claim Notes, dated April 2013).

On April 11, 2013, the *Petrishe* plaintiffs filed a Third Amended Complaint. (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 33; *see also* R.92-1, Third Am. Compl).[7] After a few

---

[7] The Third Amended Complaint recites sixteen claims. Claims 1-5 assert federal claims against the individual officers, Tenison and Kirk. Claims 6-13 assert state law claims, some against all defendants, and some against the individual officers alone. Claim 14 asserts a *respondeat superior* claim against the Village for the underlying state law claims. Claim 15 asserts a claim for negligent training and supervision against the Village. Claim 16 asserts a statutory indemnity

attempts to locate the appropriate contact person at Essex, (R.98-1 at CC 00046-47, CC 00051), CCMSI notified Essex of the Underlying Action on May 21, 2013. (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶¶ 46-47; R.101-8, May 21, 2013 Letter) ("This letter will serve to inform you of a claim since . . . the medical specials amount to more than two million dollars")). It is undisputed that neither the Village nor CCMSI notified Essex of the Underlying Action before May 2013. (R.101, Essex Rule 56.1(a)(3) Stmt. Facts ¶ 48). Phyllis Modlin ("Modlin")—Essex's claims manager—testified that she thereafter received "status reports [and] evaluations" from defense counsel. (R.101-11, Modlin Dep. Tr. at 52-56). According to Modlin, however, had she known of the Petrishe claim earlier, she would have (*i*) "held regular conference calls" with defense counsel, ACE, and CCMSI, (*ii*) "retained monitoring counsel to corroborate and validate the assessment of defense counsel that the case had no value," (*iii*) "requested [that] experts be retained at an earlier point in time," and (*iv*) "initiated earlier settlement discussions . . . where the defense may have had more leverage to settle the case for a lower amount." (*Id.* at 61-62, 67).

### D.     2014

On January 21, 2014, the *Petrishe* plaintiffs made a $12 million settlement demand in the Underlying Action. (R.115, Essex Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 27-29). On January 22, 2014, Essex issued a reservation of rights letter, reserving its right to deny coverage

---

claim against the Village for the underlying federal claims. (*See* R.92-1, Claim 1: Unreasonable Seizure (Taser); Claim 2: Excessive Force (Shooting); Claim 3: Failure to Intervene (Tenison); Claim 4: Due Process Violation; Claim 5: Conspiracy to Interfere with Due Process Rights; Claim 6: Battery; Claim 7: Assault; Claim 8: Malicious Prosecution; Claim 9: Intentional Infliction of Emotional Distress (Petrishe); Claim 10: Abuse of Process; Claim 11: Intentional Infliction of Emotional Distress (Caputo-Petrishe); Claim 12: Loss of Consortium (Caputo-Petrishe); Claim 13: Intentional Infliction of Emotional Distress (McGann); Claim 14: Respondeat Superior Liability for State Law Claims; Claim 15: Negligent Training and Supervision; Claim 16: Indemnity – 745 ILCS 10/9-102).

to the Village on several grounds, including "on the basis that the Village failed to comply with the policy condition which requires notice as soon as practicable of any accident or occurrence which may result in a claim if the claim may involve the Essex Policy or any underlying insurance."  (R.98-1, CC 00140-151, Reservation of Rights Letter, dated Jan. 22, 2014).  Essex filed this declaratory judgment action on June 17, 2014.  (R.1, Complaint).

Essex participated in settling the Underlying Action on behalf of the Village, including with respect to the September 23, 2014 settlement conference, during which "all parties to the present action and the Underlying Action" agreed to "settle the Underlying Action for $3,000,000."  (R.113, CCMSI Rule 56.1(b)(3)(B) Stmt. Facts ¶ 35; R.111 Essex Rule 56.1(b)(3)(B) Stmt. Facts ¶ 20).  On November 14, 2014, the parties to the Underlying Action filed a Stipulation to Dismiss.  (R.92, Village Rule 56.1(a)(3) Stmt. Facts ¶ 11; *see also* R.92-2, Stipulation to Dismiss).  The district court dismissed the Underlying Action on November 17, 2014.  (R.92, Village Rule 56.1(a)(3) Stmt. Facts ¶ 12).  In December 2014, Essex and the Village executed the Non-Waiver Agreement.  (R.37-A).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  "The mere existence of *some* alleged factual dispute will not defeat summary judgment."  *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) (quoting *Anderson*, 477 U.S. at 247-48).

In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015).

## ANALYSIS

Essex and CCMSI cross-moved for summary judgment on the notice issue[8] and do not dispute any material facts. After reviewing both submissions, the Court agrees with CCMSI that the Village did not breach the Notice Condition of the Essex Policy.

## I.    Applicable Legal Principles

Notice provisions in insurance contracts "impose valid prerequisites to insurance coverage." *Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 311, 856 N.E.2d 338, 343 (2006).[9] Thus, "[b]reaching a policy's notice clause by failing to give reasonable notice will defeat the right of the insured party to recover under the policy." *Id.* at 312. This is true even with respect to excess insurance contracts. *See Kerr v. Illinois Cent. R. Co.*, 283 Ill. App. 3d 574, 585, 670 N.E.2d 759, 768 (1st Dist. 1996) ("Compliance with the notice provision is a condition precedent to coverage and if breached, the insurer will not be liable under the policy"). Notice provisions in excess insurance contracts recognize that an "excess insurer should not be forced to rely on its insured or the primary insurer to protect its interests where timely notice

---

[8]  The Village joined CCMSI's motion.
[9]  The parties do not dispute the application of Illinois law.

would provide the excess insurer with an opportunity to pursue its own investigation." *Id.* at 582.

Where, as here, an insurance policy requires an insured to notify the insurer "as soon as practicable," courts interpret that phrase to mean "within a reasonable time." *Country Mut.*, 222 Ill. 2d at 311. "The term 'immediate,' in the context of insurance policy notice provisions, has been interpreted in a similar manner[.]" *W. Am. Ins. Co. v. Yorkville Nat. Bank*, 238 Ill. 2d 177, 186, 939 N.E.2d 288, 294 (2010). "Whether notice has been given within a reasonable time depends on the facts and circumstances of each case." *Id.* at 185. Where, however, the material facts are undisputed, "the reasonableness of notice to an insurer by its insured is a question of law." *Kerr*, 283 Ill. App. 3d at 583; *see also Montgomery Ward & Co. v. Home Ins. Co.*, 324 Ill. App. 3d 441, 448, 753 N.E.2d 999, 1004 (1st Dist. 2001).

The Illinois Supreme Court has looked to several factors in assessing whether an insured's notice is reasonable, including: (1) the specific language of the policy's notice provision; (2) the insured's sophistication in insurance matters; (3) the insured's awareness of an event which may trigger insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer. *Country Mut.*, 222 Ill. 2d at 313; *Yorkville*, 238 Ill. 2d at 185-86. Illinois courts have made clear that these factors "*may* be considered and, though relevant, are not individually determinative." *Hartford Cas. Ins. Co. v. ContextMedia, Inc.*, 65 F. Supp. 3d 570, 579 (N.D. Ill. 2014) (citation and quotation omitted).

Essex argues that, in consideration of these factors, Oak Lawn's 30-month delay in providing notice of the Underlying Action was unreasonable, constituting a breach of the Notice Condition. CCMSI, in turn, argues that its notice *was* reasonable under the circumstances, pointing to the two-year stay in the Underlying Action and to defense counsel's assessment that

the related criminal case was a "slam-dunk" one which would obviate civil liability for Defendants Tension, Kirk, and the Village. The Court examines each *Country Mutual* factor, in turn.

## II.     Application of the *Country Mutual* Factors

### A.     Specific Language of the Essex Policy

The Court first considers the specific language of the Essex Policy in determining the reasonableness of Oak Lawn's notice.

#### 1.     Interpretation of an Excess Insurance Policy

In construing the language of an insurance policy, a court must view the policy "as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *AMCO Ins. Co. v. Erie Ins. Exch.*, 2016 IL App (1st) 142660, ¶ 20, 2016 WL 631982, at *5 (1st Dist. Feb. 16, 2016) (citation and quotation omitted); *see also U.S. Fire Ins. Co. v. Schnackenberg*, 88 Ill. 2d 1, 5, 429 N.E.2d 1203, 1205 (1981) ("We suspect that it is usually, if not always, possible in cases involving the interpretation of contracts as complex as the modern insurance policy to isolate particular phrases or clauses which are then urged in support of the desired result. That approach does little, however, to resolve the problem"). "If the words of a policy are clear and unambiguous, a court must afford them their plain and ordinary meaning." *AMCO*, 2016 WL 631982 at *5 (citing *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108, 607 N.E.2d 1204 (1992)). If, however, the policy language "is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer and in favor of the insured." *Id.* (citation omitted); *see also Tribune Co. v. Allstate Ins. Co.*, 306 Ill. App. 3d 779, 786, 715 N.E.2d 263, 269 (1st Dist. 1999) ("Where an insurance contract is ambiguous, and other evidence does not resolve the ambiguity, the court must adopt any reasonable interpretation the policyholder suggests").

Illinois courts recognize that primary and excess insurance policies "inherently serve different functions, cover different risks and attach at different stages." *Ingalls Mem'l Hosp. v. Executive Risk Indem.*, Inc., No. 1-10-0831, 2011 WL 10069004, at *4 (Ill. App. Ct. June 30, 2011) (citation omitted). "Since excess coverage is contingent on exhaustion of primary or underlying policies, excess insurers generally do not require notification of occurrences until the excess policy is reasonably likely to be implicated." *Tribune*, 306 Ill. App. 3d at 790; *see also L.R. Nelson Corp. v. Great Am. Ins. Co.*, No. 06-CV-1252, 2008 WL 4391832, at *5 (C.D. Ill. Sept. 22, 2008) (recognizing that, generally, excess policies "allow the insured more discretion than do primary policies when it comes to choosing the proper point in time to notify the insurer of a potential claim"). The *Tribune* court, for example, interpreted excess policy provisions requiring notice of a claim when it "appears likely to involve" the excess policy as giving "the insured considerable discretion for deciding whether a claim appears reasonably likely to result in liability within the coverage." 306 Ill. App. 3d at 791. On the other hand, the *Tribune* court affirmed summary judgment on untimely notice grounds in favor of one excess insurer, whose policy contained a "markedly different notice requirement[,]" requiring notice "whenever a claimant's total damages, without regard to liability, appeared likely to exceed $250,000." *Id.* at 789, 792.

With these principles in mind, the Court reviews the language of the Essex Policy.

### 2. Interpretation of the Excess Policy

The Notice Condition contains two principal notice provisions – Subsection (a) relating to "any accident or occurrence," and Subsection (b) relating to "the claim or suit." Specifically, the Essex Policy provides:

You must see to it that we or our authorized representative and your underlying insurers:

<div style="margin-left: 2em;">

a.    are notified as soon as practicable of any accident or occurrence which may result in a claim if the claim may involve this policy or any underlying insurance;

b.    receive notice of the claim or suit as soon as practicable. Notice shall include:
1)    How, when and where the accident or occurrence took place;
2)    The insured's name and address;
3)    The names and addresses of any injured persons and witnesses; and
4)    The nature and location of any injury or damage arising out of the accident or occurrence.

</div>

(R.6-1, Essex Policy at Section C-3). Indeed, "[i]nsurance policies are likely to contain two different notice conditions: one that requires notice of the occurrence of an incident which may fall within the policy's coverage, and one that requires notice of any lawsuit stemming from such an incident. When interpreting notice provisions, most Illinois decisions have not differentiated between the two requirements." *Country Mut.*, 222 Ill. 2d at 313-14.

Here, Essex argues that Subsection (a) and Subsection (b) are distinct notice requirements. Specifically, Essex characterizes Subsection (a) as contemplating the Village's discretion as to when an occurrence "may result" in a claim if that claim "may involve" the Essex Policy or the ACE Policy. By contrast, Essex argues, Subsection (b) contemplates no discretion on the part of the Village: if a claim is made, or a suit is filed, it must give notice "as soon as practicable." As further evidence of this understanding, Essex points to Subsection (c) of the Notice Condition, requiring that the Village "immediately send [Essex] copies of any demands, notices, summonses or legal paper received in connection with a claim or suit involving you or any other Insured." (R.6-1, Essex Policy at Section C-3; R.117, Reply Br. at 13 ("Subsection (c) is a virtual reiteration of Subsection (b), both of which required the Village to notify Essex of the Petrishe lawsuit within a reasonable amount of time")).

According to Essex, this language is "nearly identical" to the excess policy provision at issue in *MHM Services Inc. v. Assurance Company of America*, 2012 IL App (1st) 112171, 975 N.E.2d 1139 (1st Dist. Aug. 3, 2012). The relevant notice provision in *MHM* provided:

4.07 Duties [of MHM] in the Event Of Occurrence, Claim or Suit

A) You [MHM] must see to it that we [Assurance] are notified as soon as practicable of an 'occurrence' or an offence which may result in a claim. * * *

B) Notice of an 'occurrence' or offense is not notice of a 'claim.' However, if a 'claim' is made or 'suit' is brought against any insured you must:
　　1) Immediately record the specifics of the 'claim' or 'suit' and the date received;
　　2) Notify us [Assurance] as soon as practicable; and
　　3) Provide us [Assurance] with written notice of the 'claim' or 'suit' as soon as practicable.

C) You and any other involved insured must:
　　1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the 'claim' or 'suit.'

*MHM*, 975 N.E.2d at 1153. The *MHM* court examined Subsection (B) and held that:

MHM was not contractually entitled to exercise discretion as to whether to give notice. Pursuant to paragraph 4.07, MHM was contractually required to give Assurance notice of *every* claim or suit 'as soon as practicable' regardless of the amount of potential liability or whether MHM had reason to believe the Assurance excess policy might be implicated. The notice terms in the Assurance excess policy starkly contrast with excess policies which actually give the insured discretion as to when to notify the insurer . . . [such as] "Whenever the Insured has information from which they may reasonably conclude that an occurrence covered hereunder involves injuries or damage which, in the event that the Insured shall be held liable, *is likely to involve this policy,* notice shall be sent to the Company as soon as practicable." (Emphasis added).

*Id.* at 1157.

The Court disagrees with Essex as to *MHM*'s likeness. Unlike the Notice Condition in the Essex Policy, the notice provision in *MHM* specifically distinguished between the insured's duties in the event of an occurrence versus a claim. *See id.* at 1153 ("Notice of an 'occurrence' or offense is not notice of a 'claim'"). The language clearly specified that, in the event of "*a*" claim made or "'suit' . . . *brought against any insured*," MHM must give notice and forward

copies of legal papers received "in connection with *the* 'claim' or 'suit.'" *Id.* (emphasis added). This provision is similar to ones deemed non-discretionary in other cases. *See, e.g.*, *AU Elecs., Inc. v. Harleysville Grp., Inc.*, 82 F. Supp. 3d 805, 815 (N.D. Ill. 2015) (interpreting the provision, "If a claim is made or 'suit' is brought against any insured . . . You must see to it that we receive written notice of the claim or 'suit' as soon as practicable," and observing, "[t]here is no qualification or condition: if suit, then notice"); *see also Yorkville*, 238 Ill. 2d at 181; *Northbrook Prop. & Cas. Ins. Co. v. Applied Sys., Inc.*, 313 Ill. App. 3d 457, 461-62, 465-68 (1st Dist. 2000).

Here, by contrast, Subsection (b) of the Notice Condition does not speak of "a" claim, or a suit "brought against any insured." Rather, Subsection (b) speaks of "the" claim or suit. Under its plain and ordinary meaning, "the" is a word of limitation. "[I]t indicates that 'a following noun or noun equivalent refers to someone or something previously mentioned" and particularizes "the subject which it precedes." *Sibenaller v. Milschewski*, 379 Ill. App. 3d 717, 722, 884 N.E.2d 1215, 1219 (2d Dist. 2008) (citing Webster's Third New International Dictionary 2368 (1986)); *see also Outboard Marine*, 154 Ill. 2d at 123 ("A court must strive to give each term in the policy meaning unless to do so would render the clause or policy inconsistent or inherently contradictory").

Reading the Essex Policy as a whole—as the Court must, *see AMCO*, 2016 WL 631982 at *5—Subsection (b) refers to *the* claim or suit arising from an "accident or occurrence" contemplated in Subsection (a). This reading of the Notice Condition adheres to the text and is reasonable in view of the fact that: (1) the "suit" term in Subsection (b) is not limited to "suits brought against any insured," unlike in *MHM*, *AU Electronics, Yorkville*, or *Northbrook*, and thus has no meaningful limitation absent a link to Subsection (a); (2) sections 1-4 underneath

Subsection (b) refer to "*the* accident or occurrence," plausibly linking Subsection (b) to Subsection (a); and (3) considering the nature of excess insurance, *see AMCO*, 2016 WL 631982 at *5, Essex does not need—and chose not to require—notice of each and every claim made or lawsuit filed, regardless of coverage implications. *See Tribune*, 306 Ill. App. 3d at 790.[10]

Based on this analysis, the Court agrees with CCMSI that the Essex Policy did not require the Village to notify Essex of the Underlying Action unless and until it believed such lawsuit "may involve" either the underlying insurance (including the ACE Policy) or the Essex Policy. Terms such as "may involve" and "likely to involve" grant "the insured some discretion in evaluating the case" before triggering notice duties. *MHM*, 975 N.E.2d at 1157-58 (quoting *Am. States Ins. Co. v. Nat'l Cycle, Inc.*, 260 Ill. App. 3d 299, 311, 631 N.E.2d 1292, 1301 (1994)).

### 3. Determining When to Notify Essex

Essex next argues that, "even assuming Subsection (b) permitted the Village to exercise discretion in determining when to notify Essex of the Underlying Action, it was Mr. Petrishe's potential damages, not the Village's subjective belief of its liability, that would have triggered its

---

[10] At best, the policy language in Subsection (b) is ambiguous and must be construed against Essex. *See AMCO*, 2016 WL 631982 at *5. The Court recognizes that Subsection (c) does not appear, by its terms, to link back to Subsection (a) or otherwise suggest discretion on the part of the Village in forwarding legal papers "received in connection with a claim or suit involving [itself] or any other Insured." As Essex itself acknowledges, however, Subsections (b) and (c) contemplate parallel duties once a triggering lawsuit is filed. (R.117, Reply Br. at 13-14). Essex does not claim an independent breach of Subsection (c), but, rather, relies upon the similarity between Subsections (b) and (c) to bar the application of the "mend-the hold" doctrine. (*Id.* at 12-13). *See generally Liberty Mut. Ins. Co. v. Am. Home Assur. Co.*, 368 Ill. App. 3d 948, 958, 858 N.E.2d 530, 539 (1st Dist. 2006) ("In the insurance context, courts have precluded insurers from denying a claim on one basis and then changing the basis for denial during litigation"). The Court therefore interprets Subsection (c) in conjunction with its interpretation of Subsections (a) and (b).

notice obligation." (R.117, Essex Reply Br. at 3, 8; R.109, Response Br. at 6). As CCMSI observes, however, the "Essex Policy is completely silent as to the method of determining whether a claim may involve the policy. An insured could reasonably interpret this provision to allow an evaluation of *both* liability and damages." (R.118, CCMSI Reply Br. at 5). Ultimately, the Court agrees with CCMSI.

The parties do not dispute that CCMSI and the Village knew, throughout 2010-2012, that Petrishe's claimed damages—namely those resulting from four bullet wounds and a six-week stay in the ICU—far exceeded the $150,000 SIR. The parties also do not dispute, however, that neither CCMSI nor the Village believed that the Village's potential liability in the Underlying Action could implicate the ACE Policy or the Excess Policy until February 2013, *after* Petrishe's acquittal. Contrary to Essex's suggestion, moreover, the Court cannot deem this "subjective belief" unreasonable as a matter of law. The record reflects that defense counsel in the Underlying Action (*i*) monitored Petrishe's criminal case throughout 2011-2013, (*ii*) "was confident that the attempted murder charges brought against the plaintiff would result in a conviction," (*iii*) characterized litigation materials as "extremely favorable," and (*iv*) even *after* the unanticipated acquittal—and despite its "significant exposure"—believed the Underlying Action "to be a highly defensible" one. The record further reflects that, after receiving notice of the Underlying Action and corresponding with CCMSI and defense counsel, ACE closed its claim file. As Fee testified, "the information that was provided from defense counsel was essentially that this was a slam-dunk criminal case, and that most of this [civil action] was going to go away." (R.101-10, Fee Dep. Tr. at 41). Given these circumstances, the Court does not view the Village's liability predictions as inherently unreasonable. *See, e.g.*, *Pac. Emp'rs. Ins. Co. v. Clean Harbors Envtl. Servs., Inc.*, No. 08 C 2180, 2011 WL 813905, at *6 (N.D. Ill. Feb.

24, 2011) (insured's 33-month delay in notifying excess insurer of underlying lawsuit not held unreasonable where defense counsel had opined that "the case was one of 'non-liability'").

The Court further notes that, had Essex desired to trigger notice based on damages alone, irrespective of liability, it could have requested policy language to that effect. The ACE Policy, for example, required automatic notice of any occurrence or claim, "regardless of the coverage or liability," where the potential exposure exceeded 50% of the SIR, or which involved "bodily injury resulting from use of a weapon or restraining device by law enforcement." (R.6-2, ACE Policy at Section A-8(b)(i), (iii)(9)); *see also Tribune*, 306 Ill. App. 3d at 792 (excess insurer required notice "whenever a claimant's total damages, without regard to liability, appeared likely to exceed $250,000"). Essex did not insist on such language. Essex also could have requested language requiring notice whenever one of its underlying policies, such as the ACE Policy, required notice. *See, e.g.*, *Country Life Ins. Co. v. St. Paul Surplus Lines Ins. Co.*, No. 03-1224, 2005 WL 3690568, at *4 (C.D. Ill. Aug. 30, 2005) ("The Federal policy did not require notice of any occurrence that might give rise to a potential claim as soon as practicable; rather, the policy plainly required notice as soon as practicable after any notice was given to an insurer providing underlying coverage"). Again, Essex did not do so. Finally, Essex could have eliminated the discretionary "may involve" language altogether, requiring unconditional notice of any claim or any suit brought against the Village, irrespective of both damages and liability. As noted above, however, Essex failed to do so. This failure distinguishes the Essex Policy from the primary insurance policies at issue in Essex's cited authorities. *See, e.g.*, *ContextMedia*, 65 F. Supp. 3d at 579-80 (noting that "the belief that one is not liable is not an excuse for failing to give notice"); *W. Bend Mut. Ins. Co. v. United Rd. Towing Servs., Inc.*, No. 06 C 4848, 2008 WL 4442628, at

*4 (N.D. Ill. Sept. 29, 2008) (same); *Tribune*, 306 Ill. App. 3d at 787-88 (analyzing a primary insurer's notice provision and recognizing the same).

Because the "may involve" clause at issue is ambiguous, and no evidence resolves the ambiguity, the Court construes it in favor of the Village. *See Tribune*, 306 Ill. App. 3d at 786 ("Where an insurance contract is ambiguous, and other evidence does not resolve the ambiguity, the court must adopt any reasonable interpretation the policyholder suggests"). Here, the Court interprets the (*i*) "may involve" language and the (*ii*) "as soon as practicable" language as requiring notice of the Underlying Action within a reasonable time, but only when it appeared "reasonably likely to result in liability within the coverage" of the ACE Policy or the Essex Policy. *See id.* at 791.

### B.       Village of Oak Lawn's Sophistication

The Court next analyzes the Village's sophistication in insurance matters. The Village concedes this point, acknowledging that "there is no dispute that the Village is a sophisticated entity that entered into an insurance contract with Excess for excess coverage with a $1 million underlying primary policy and a $150,000 self-insured retention." (R.118, CCMSI Reply Br. at 7-8). This factor, therefore, weighs in favor of Essex. *See MHM*, 975 N.E.2d at 1159.

### C.       The Village's Awareness of a Potentially Covered Event

The Court next examines the Village's "awareness of an event which may trigger insurance coverage." *Country Mut.*, 222 Ill. 2d at 313. Here, Essex looks to the undisputed facts: the Village knew about the Petrishe shooting on December 8, 2010, knew about the Underlying Action and its allegations on December 15, 2010, and gave ACE notice on March 15, 2011. Yet, Essex argues, the Village did not inform Essex of the incident or the lawsuit until May 21, 2013.

The Village responds that, while it had "awareness" of the Petrishe claim in 2010, it did not believe that such claim "may trigger insurance coverage" until February 2013, after Petrishe's acquittal. Indeed, the record reflects that CCMSI set an initial reserve of only $10,000 and—prior to 2013—did not anticipate the Petrishe claim exceeding the Village's $150,000 SIR. As noted above, moreover, the ACE Notice Condition is distinct from the Notice Condition contained in the Essex Policy. The Court does not, therefore, interpret CCMSI's 2011 notice to ACE as an admission that the Petrishe claim "may trigger insurance coverage." Ultimately, the Court's examination of this factor is similar to the Court's examination of the first factor, *supra*, and weighs in favor of the Village.

### D. The Village's Diligence in Ascertaining Coverage Availability

The fourth factor—the Village's diligence in ascertaining the availability of excess coverage—also weighs in favor of the Village. The Court is not convinced by Essex's argument that the Village's delay "had nothing to do with its belief about its liability. Rather, the delay was attributable to the Village's failure to read its insurance contract[.]" (R.102, Essex Opening Br. at 11). This argument assumes that the Notice Condition required automatic notice of every lawsuit filed against the Village – an assumption not borne out by the policy language. This argument further ignores that the Village entrusted CCMSI to review its insurance contracts, (R.101-7, Deetjen Dep. Tr. at 69), and that CCMSI —shortly after the unanticipated criminal acquittal and the lift of the stay in the Underlying Action—requested the Essex Policy and provided notice to Essex. (R.98-1 at CC 0046-47, CC 00051, Petrishe Claim Notes; R.113, CCMSI Rule 56.1(b)(3)(B) Stmt. Facts ¶ 53).

Essex again likens this case to *MHM*, where the court held that MHM's "supposed belief that [the underlying suit] was defensible within the limits of its [primary] policy" was "not a

credible position." *MHM*, 975 N.E.2d at 1160. In forming this conclusion, however, the *MHM* court looked to several specific factors unique to that case, including: (*i*) the "startling, horrendous" nature of the underlying allegations and the damages claimed; (*ii*) the rapid expenditure on defense; (*iii*) that, after denying MHM summary judgment, the judge advised that MHM "would most certainly lose a jury trial and should immediately hire a mediator and settle the case for at least $5 million;" (iv) that MHM ignored its counsel's recommendation to notify its insurers, even after he opined that a "multi-million dollar judgment" was "over 85% probable;" (v) that MHM eventually increased its settlement accrual in acknowledgment that a settlement or judgment would exceed the limits of its primary policy; and (vi) that MHM provided notice to Assurance—25 months after the underlying lawsuit was filed—only because a new attorney, who "asked for and read all the insurance policies," joined the defense team. *See id.* at 1160-61.

Except with respect to damages allegations, none of these circumstances are present here.[11] Unlike in *MHM*, the record does not reflect "numerous developments in the [underlying] case . . . which would have prompted a reasonable person to give notice to its excess insurance carrier." *Id.* at 1160. To the contrary, there were *no* developments in the Underlying Action throughout its two-year stay (January 2011 through March 2013). The Court further notes that, unlike in *MHM*, defense counsel in the Underlying Action continued to view the case as "highly defensible" on liability grounds, even after the unanticipated acquittal. In view of the Village's

---

[11] The court in *MHM* examined complaint allegations detailing MHM's negligent screening processes, which "allowed a recidivist, sadistic predator to sexually assault and attempt to murder a teenage girl," who then "bore emotional and physical scars" as a result of this incident. *Id.* at 1160. Here, the *Petrishe* complaint describes severe injuries and requests compensatory and punitive damages as a result of the December 8, 2010 police shooting. The Court disagrees with *MHM*, however, to the extent it suggests that complaint allegations alone—without regard to policy language and irrespective of subsequent case developments—dictate when an insured must notify an excess insurer of a pending lawsuit.

potential liability, however, the Village adjusted its reserve and provided notice to Essex in May 2013.[12]

In this case, CCMSI and the Village do not claim mere "ignorance of the existence of the insurance policies" as an excuse for their delayed notice. *See Fairmount Park, Inc. v. Travelers Indem. Co.*, 982 F. Supp. 2d 864, 872 (S.D. Ill. 2013). In view of CCMSI's notice to Essex once the stay status and liability assessment in the Underlying Action changed in early 2013, the Court concludes that the fourth *Country Mutual* factor weighs in favor of the Village.

### E.      Prejudice to Essex

Lastly, the Court considers prejudice to Essex resulting from the 30-month delay in receiving notice of the Underlying Action. According to Essex, by May 2013, "the question of whether Essex could effectively participate in the defense had already been answered. Mr. Petrishe had been acquitted of criminal charges and the case had a multi-million dollar value with no hope of settling within the underlying coverage." (R.102, Essex Opening Br. at 13). Essex disregards, however, the critical fact that the Defense Condition would have been of no use to it throughout 2011-2013; the district court had stayed the Underlying Action for two years pending the criminal proceedings. As CCMSI recognizes, none of Essex's cited authorities "involved a civil action that was stayed in its entirety . . . because it was connected to a concurrent pending criminal action." (R.118, CCMSI Reply Br. at 10). Once the Underlying Action became active, Essex waited several months to issue a reservation of rights letter, and

---

[12]  The Court notes that Essex does not specifically challenge the timeliness of CCMSI's notice from the time of Petrishe's acquittal (February 2013) to the ultimate provision of notice (May 2013).

then participated in settling the action through its eventual dismissal in November 2014.[13]  Essex has not made a convincing showing of prejudice.[14]

In essence, Essex asserts that had it known of the Petrishe claim earlier, it would have reassessed the likelihood of acquittal in the criminal case and negotiated a lower civil settlement during the criminal case's pendency.  This speculation alone, however, cannot overcome the other facts and circumstances unique to this case, including (*i*) the two-year stay; (*ii*) defense counsel's ongoing assessment of non-liability; (*iii*) ACE's inclination to close its claim file; (*iv*) the uniformly-held belief, up until February 2013, that the Village could handle the Petrishe claim well within its $150,000 SIR; and (*v*) the policy language contemplating insured discretion as to the timing of notice to its excess insurer.

The Court declines to find, under these specific facts and circumstances, that CCMSI's 30-month delay in giving notice to Essex was unreasonable as a matter of law.  *See Yorkville*, 238 Ill. 2d at 185.

---

[13]  Contrary to Essex's "no hope" suggestion, moreover, defense counsel in the Underlying Action continued to confirm the availability of "significant liability defenses" even after Petrishe's acquittal.  (R.98-1 at CC 00050).

[14]  The Court acknowledges that "lack of prejudice is not a condition which will dispense with the requirement of reasonable notice."  *Country Mut.*, 222 Ill. 2d at 316.  Here, however, the Village has given "reasonable notice according to the terms of the insurance policy," and thus the Court considers lack of prejudice in its analysis.  *Id.* at 316-17.

**CONCLUSION**

For the foregoing reasons, the Court grants CCMSI's motion for summary judgment on the notice issue (R.104) and denies Essex's motion for summary judgment regarding the same. (R.100). In light of this disposition, the Court denies as moot Oak Lawn's motion to defer or, alternatively, to extend the filing of dispositive motions directed to the Third-Party Complaint. (R.94).

**Dated:** May 31, 2016

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge